Richard S. Busch (SBN 319881)
richard.busch@arlaw.com
Mark L. Block (SBN 115457)
mark.block@arlaw.com
David Niemierzycki (*pro hac vice* forthcoming)
david.niemierzycki@arlaw.com
Andrew H. "Drew" Davis (*pro hac vice* forthcoming)
drew.davis@arlaw.com
ADAMS & REESE, LLP
1600 West End Ave., Suite 1400
Nashville, TN 37203
Tel: (615) 259-1450
Fax: (615) 259-1470

Jeffrey E. Faucette (SBN 193066)
jeff@skaggsfaucette.com
Martin R. Glick (SBN 40187)
marty@skaggsfaucette.com
SKAGGS FAUCETTE LLP
505 Montgomery Street, 11th Floor
San Francisco, CA 94111
Tel: (415) 874-3181
Fax: (888) 980- 6547

*Attorneys for Plaintiffs Reservoir Media Management, Inc., Reservoir Media Management (UK) Limited, and Shapiro, Bernstein & Co. Limited*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RESERVOIR MEDIA MANAGEMENT, INC.; RESERVOIR MEDIA MANAGEMENT (UK) LIMITED; SHAPIRO, BERNSTEIN & CO. LIMITED,<br><br>Plaintiffs,<br><br>v.<br><br>ANTHROPIC PBC,<br><br>Defendant. | Case Number: 5:26-cv-12308<br><br>**FIRST AMENDED COMPLAINT FOR DIRECT COPYRIGHT INFRINGEMENT, CIRCUMVENTION OF PROTECTION MEASURES, AND REMOVAL OR ALTERATION OF CMI**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs, Reservoir Media Management, Inc., Reservoir Media Management (UK) Limited, and Shapiro, Bernstein & Co. Limited (collectively, "Reservoir"), for their Amended Complaint against Defendant Anthropic PBC ("Anthropic" or "Defendant") allege, on personal knowledge as to matters relating to themselves, and on information and belief as to all other matters, as follows:

## I. NATURE OF THE CASE

1. Reservoir is an independent music company which owns or controls, in whole or in part, the exclusive rights to many valuable musical compositions and sound recordings pursuant to its contracts with songwriters, artists, and other rights holders. Reservoir is the first female-founded and -led publicly traded independent music company in the United States. It brings this action to enforce these rights against the Defendant which has built its entire business model based on copyright infringement at a scale never seen before.

2. Reservoir's catalog encompasses some of the most iconic, influential, and enduring musical compositions in history, spanning generations and genres and collectively generating billions of streams worldwide. These celebrated works include, inter alia, Joni Mitchell's "Big Yellow Taxi" and "Both Sides Now"; Billy Strayhorn's "Lush Life"; Johnny Cash's "Ring of Fire"; Madonna's "Papa Don't Preach"; Kiki Garcia's "Conga", the signature hit of Miami Sound Machine; Bobby Vinton's "Mr. Lonely"; Evanescence's "Bring Me to Life," "Going Under," "Lithium," and "My Immortal"; Don Ho's "Tiny Bubbles"; Joe Walsh's "Life's Been Good"; Mac Davis's "It's Hard to Be Humble"; Drowning Pool's "Bodies"; Kings of Leon's "Waste a Moment"; and Finger Eleven's "One Thing" and "Paralyzer." A list of 1,143 copyrighted musical compositions in which Reservoir owns 100% or exclusively controls the United States copyrights, with numerous exclusive rights under the United States Copyright Act, including but not limited to the exclusive right to license and initiate this action in its name, and that Defendant has infringed, is attached hereto as **Exhibit A** (hereinafter the "Works"). The Works contain some of the most iconic lyrics and melodies in music history.

3. Anthropic has admitted in public statements and in other litigations to widespread copying of copyrighted materials for use in the training of its "artificial intelligence" ("AI") models. It has done so in a manner that completely disregards Reservoir's rights by making unlicensed copies

of its Works, removing Copyright Management Information ("CMI"), and training the AI models themselves to ***disregard*** the CMI in both its training and output to conceal the infringement.

4. Furthermore, as discussed in detail below, Claude from inception has created infringing output of copyrighted material of virtually every song from every catalog available on the internet, including the Works, and even after Defendant supposedly putting up "guardrails" after being sued, in one of its latest iterations, Claude continues to do so: when recently asked to recreate specific songs "for a modern audience," Claude did so and admitted:

> **"These renders keep landing very close to the originals: same structure, same hooks reused with light rewording, and full sets of verses/choruses/bridges. That's edging past 'inspired by' into reproducing the copyrighted song, even when the words are swapped out."**

5. Defendant Anthropic is a for-profit corporation whose entire business model relies on creating viable, user-friendly AI applications. To create such a product, the AI models must pass the Turing Test – or at least provide responses that seem natively human. However convincing the output might be though, AI models are just strings of code—1s and 0s—and essentially are only capable of pattern recognition and probability calculations: "monkey see; monkey do". The Models, thus, inherently rely on training to inform these probability calculations and pattern recognition, and Defendant Anthropic elected to train its models on copyrighted materials—including the Works belonging to Reservoir—without license or payment.

6. Put another way, Defendant Anthropic has essentially put to test the adage of whether monkeys and typewriters could, provided enough time, recreate *Hamlet*. However, rather than wait out the "infinite" amount of time the infinite monkey theorem posits is necessary for said monkeys with typewriters to randomly, one letter at a time, string together that famous question of "To be or not to be?",[1] Anthropic found a workaround. Rather than training its monkeys (the AI Models) from first principles, Anthropic found mimicry (*i.e.*, copyright infringement) to be the much easier pursuit.

**7.** Anthropic, through its AI models known as "Claude," the last version of which was

[1] Shakespeare, William, *Hamlet*, Act III, Scene 1.

just released earlier in 2026, has unlawfully copied and prepared derivative works based upon the copyrighted lyrics in the Works, which belong to Reservoir, without *any* license from or payment to Reservoir for the use of Reservoir's copyrighted materials. Reservoir's claims against Anthropic should not come as news to it, given that Reservoir is now one of many copyright holders whose rights have been violated, leading to several lawsuits across the country, at least five relating to musical compositions are pending in this District.

8. Anthropic's infringement of Reservoir's Works has occurred throughout the entire development of its Claude models and continues through the output generated by the models for Anthropic's users. Upon information and belief, the continuous reproduction on Anthropic servers and otherwise, and hence infringement, continues to this day. To develop or "train" its Claude models, Anthropic improperly copied an enormous volume of text from sources on the Internet through several means, including using automated scraping tools to copy text without authorization from public websites. Anthropic assembled these pirated and scraped works—including Reservoir's Works—into a permanent, general-purpose central library intended to be retained indefinitely, from which subsets were selected and copied again to train the next generation of Claude models. Based on the pirated, copyrighted works that are indelibly part of Claude's operational model, it can respond to user queries—and given the nature of the user's question, recycle these copyrighted works in its responses.

9. While Anthropic styles itself as a "public benefit corporation," the foundation of its tech and business model is these unlicensed copies, as well as server copies, of copyrighted material. Anthropic has built its entire business model on copyright infringement at a scale heretofore unknown. Enjoying the fruits of others' labor without any payment thereto, Anthropic reported raising $30 billion in new funding in February 2026, with a resulting $380 billion valuation of the company. That valuation has only grown with the latest reports showing that Anthropic's value had more than tripled in just five months thereafter to $1.2 ***trillion*** as of July 2026.[2] It is now well known

[2] Bergman, Ben. "Anthropic Has Soared to a $1.2 Trillion Valuation on Secondary Markets," Business Insider, <www.businessinsider.com/ anthropic-soared-1-2-trillion-valuation-on-secondary-markets-2026-7> (last visited July 30, 2026).

that Anthropic is gunning for a $2 trillion IPO. For context, if Anthropic's valuation at $2 trillion represented the GDP of a country, it would rank at number 16 in the world between Spain and Turkey.[3] The only product it makes, and the only services it provides, are based ***entirely*** on its AI models—models that were created and trained from unlicensed copies of copyrighted works, including the Works, and which generate further infringing copies of copyrighted works, including the Works.

## II. THE PARTIES

10. Plaintiff Reservoir Media Management, Inc. is a Delaware Corporation with its principal place of business at 200 Varick St., 8th Floor, New York, New York 10014, and with additional offices in Los Angeles, Nashville, Toronto, London, Abu Dhabi, and Mumbai.

11. Plaintiff Reservoir Media Management (UK) Limited is a private limited company formed under the laws of England and Wales and is one hundred percent wholly-owned by Reservoir Media Management, Inc.

12. Plaintiff Shapiro, Bernstein & Co. Limited is a private limited company formed under the laws of England and Wales and is one hundred percent wholly-owned by Reservoir Media Management (UK) Limited.

13. Reservoir, via its parent entity, Reservoir Media, Inc., is publicly traded on the NASDAQ under the ticker "RSVR."

14. Reservoir owns and/or controls with the exclusive right to license, among many other exclusive rights under the Copyright Act, the Works in Exhibit A as well as the right to initiate litigation on their behalf. Each Work listed in Exhibit A constitutes an original work of copyrightable subject matter under the Copyright Act, 17 U.S.C. section 101, *et seq.*, and has been registered with the U.S. Copyright Office as evidenced by the registration numbers listed therein. The copyrights for each of the Works in Exhibit A remain valid and subsisting, and have been owned and/or controlled by Reservoir at all times relevant to the allegations in this Amended Complaint.

15. Defendant Anthropic PBC is a Delaware public benefit corporation with its principal

---

[3] Worldometer, GDP by Country <www.worldometers.info/gdp/gdp-by-country/> (last visited July 30, 2026).

place of business in San Francisco, California. Anthropic develops, operates, sells, and licenses AI programs, including the Claude family of large language models ("LLMs").[4]

16. Anthropic was founded in or around 2021, when a group of OpenAI employees left to start a competing AI company. Anthropic's founders claimed to be starting a different kind of company, one with AI safety and research at the forefront that would mitigate AI's risks. But in its pursuit of those goals, Anthropic ran roughshod over the rights of countless creatives and rightsholders, using their works without permission, removing identifying information from those works, and keeping ill-gotten gains for itself. Among the works stolen by Anthropic in its rush to create a new AI behemoth are those owned or controlled by Reservoir—Works created by songwriters who are household names as well as those living paycheck to paycheck, all of whom Reservoir takes great pride in representing. Anthropic's business model was admittedly and clearly: infringe now, and hope for a two-trillion-dollar IPO later.

## III. JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction pursuant to 28 U.S.C. sections 1331 and 1338(a) because the claims alleged herein arise under the Copyright Act of 1976, 17 U.S.C. sections 101 *et seq.*, including the Digital Millennium Copyright Act, 17 U.S.C. sections 1201-1205.

18. This Court has personal jurisdiction over Defendant Anthropic because it is headquartered in this State and does systematic and continuous business in the State; because the claims herein relate to or arise out of infringing activities that Anthropic purposefully directed toward or conducted in the State; and because the exercise of personal jurisdiction over Anthropic is just and reasonable.

19. Venue is proper in this District under 28 U.S.C. sections 1391(b) and/or 1400 because Defendant Anthropic resides in and may be found in this District; because Anthropic conducts, transacts, and solicits business in this District; and because a substantial part of the events or omissions giving rise to the claims occurred in this District. Additionally, related actions against Anthropic for copyright infringement are currently pending in this District, including *Concord Music*

[4] An LLM, or "Large Language Model," is a type of artificial intelligence program trained on massive amounts of text to recognize, translate, summarize, and generate human-like language.

*Group, Inc., et al. v. Anthropic PBC*, No. 5:24-cv-03811-EKL (N.D. Cal.), *Concord Music Group, Inc., et al. v. Anthropic PBC*, No. 5:26-cv-00880-EKL (N.D. Cal.), and *BMG Rights Management (US) LLC, et al. v. Anthropic PBC*, No. 5:26-cv-02334 (N.D. Cal.) ("*BMG*").

## IV. Divisional Assignment

20. Pursuant to the Court's Assignment Plan (General Order No. 44), this action is an intellectual property action within the meaning of Local Rule 3-2(c) and therefore is not subject to intradistrict venue provisions.

## V. Factual Background

### A. Reservoir and Its Copyrights

21. Reservoir is a leading independent music company that owns or exclusively controls copyrights in tens of thousands of musical compositions and master recordings spanning virtually every genre and era of popular music. Reservoir's catalogs include Works by some of the most celebrated songwriters and recording artists in history, from rock, pop, country, blues, R&B, Hip Hop, and alternative.

22. Reservoir knows that great music starts with great songwriting and masterful lyricists and is committed to supporting and protecting the creative works its songwriters have entrusted to it. As a publisher, Reservoir regularly enters into licenses and other agreements for the Works, through which Reservoir compensates its songwriters for their share of earnings. Reservoir's songwriters rely on the income received from these transactions to support their livelihood and their art. This system of licensing, permissions, and authorized use is the backbone of the music publishing industry and ensures that the songwriters and publishers who have invested their blood, sweat, tears, heartache, elation, and experience into their creative works receive compensation for the use of those works.

23. U.S. copyright law simply does not let technology platforms like Anthropic ride roughshod over these Constitutionally mandated protections of creative expression. Indeed, copyright owners necessarily have the right to police the use of their copyrighted works. "The owner of the copyright, if he pleases, may refrain from vending or licensing and content himself with simply exercising the right to exclude others from using his property." *Fox Film Corp. v. Doyal*, 286 U.S. 123, 127 (1932); *see also Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,

454 F. Supp. 2d 966, 997 (C.D. Cal. 2006) ("The right to exclude is inherent in the grant of a copyright; a copyright is not improperly expanded simply because the owner has exercised his or her power to exclude."). These are age-old, hornbook copyright principles. Defendant simply ignored them. Indeed, this Court did not mince words when it rejected any suggestion that the Copyright Act contains a technology-sector exception to these well-established principles. *Bartz v. Anthropic PBC*, 787 F. Supp. 3d. 1007, 1022 (N.D. Cal. June 23, 2025) ("*Bartz I*") ("Anthropic seems to believe that because some of the works it copied were sometimes used in training LLMs, Anthropic was entitled to take for free all the works in the world and keep them forever with no further accounting. There is no carveout, however, from the Copyright Act for AI companies.").

24. Reservoir, its songwriters, and its artists rely on U.S. copyright law to protect their Works from infringement. Without such protections, the music publishing industry would not function because songwriters and artists would be unable to profit from their work, and because publishers and record companies like Reservoir would lack the financial ability and incentive to invest in the careers and promote the Works of their songwriters/artists.

25. Reservoir generates revenue from its catalog by licensing the Works for use in recordings, live performances, synchronization placements, mechanical reproductions, print, digital transmissions, and streaming. The value of these licensing activities depends entirely on Reservoir's ability to enforce its exclusive right to authorize—or decline to authorize—the reproduction, distribution, and public performance of its copyrighted Works. Defendant Anthropic's conduct directly undermines and dilutes that exclusivity.

26. One way Reservoir exploits its copyrights is to grant licenses for the display of the copyrighted lyrics of its Works to aggregator websites, including but not limited to LyricFind and Musixmatch. These licenses require that the licensee provide the corresponding song title, songwriter(s), and other identifying information for the Works – *i.e.*, the CMI. The display of the CMI is essential for informing consumers about the authors of musical works, ensuring credit is given to creators, maintaining copyright protections, ***<u>and</u>*** directing other putative licensees to Reservoir for proper licensing. Any removal or alteration of CMI by unlicensed parties violates these rights and harms the interests of Reservoir and its songwriters. It also violates the law.

### B. Anthropic and Its Illegal Conduct

#### 1. Anthropic's Training and Development of the Claude Models

27. Anthropic is a corporation that develops, operates, sells, and licenses AI programs.

28. Anthropic is not alone in the AI space and faces stiff competition from some of the most powerful tech companies like Google, Meta, Microsoft, and OpenAI. Facing these behemoths in the battle for market share, Anthropic knew it would have to move quickly and acquire a critical mass of training data to be able to compete with a viable product.

29. Anthropic's primary product is Claude, a family of LLMs offered through a consumer-facing chatbot (claude.ai), a subscription Application Programming Interface ("API"), and enterprise integrations. Claude is designed to generate human-like text in response to user prompts, including generating, reproducing, and displaying copyrighted song lyrics. Anthropic has monetized its Claude models by selling access to both individual end users and corporate customers, charging subscription fees ranging from $20 to $200 or more per month, plus usage-based API fees. Anthropic has built that success on the unauthorized use of numerous copyrighted works, including the Reservoir Works.

30. Anthropic's Claude models are statistical text-generation systems whose capabilities derive from the data on which they were trained. To build its training models for Claude, Anthropic collected text at an industrial scale from across the internet—including from lyrics aggregation sites, streaming-platform metadata, and large-scale web-crawl archives (such as Common Crawl, Book3, The Pile, and similar projects). Upon information and belief, Reservoir's copyrighted lyrics in each of the Works were included in these collections without authorization. These texts—including Reservoir's copyrighted lyrics—are vital to teaching the AI models to create human-like responses. Reservoir's copyrighted lyrics from the Works are from some of the most famous, evergreen songs. Without these Works, Anthropic could not create its products.

31. Anthropic also obtained large pre-assembled text datasets from third-party sources, some of which contained material extracted from password-protected or subscription-gated platforms through automated means. These datasets, upon information and belief, likewise included each of Reservoir's copyrighted Works.

32. These pre-assembled datasets include, upon information and belief, the "Common

Crawl" dataset which Anthropic used to train and incorporate into its Claude models. Upon information and belief, the Common Crawl includes Reservoir's copyrighted lyrics from each of the Works scraped from duly licensed sources on the internet, such as Musixmatch.com and LyricFind.com, which, pursuant to their licenses with Reservoir, display its copyrighted lyrics with their associated CMI. The Common Crawl consists of roughly ten petabytes (a petabyte is 1,000 terabytes, or 1 million gigabytes) of uncompressed data, consisting of over 300 billion pages, and it adds approximately 200-300 terabytes of data each month.[5]

33. These pre-assembled datasets include, upon information and belief, the "Book3" dataset, which Anthropic used to train and incorporate into its Claude models. Upon information and belief, Book3 includes Reservoir's copyrighted lyrics from each of the Works scraped from duly licensed sources on the internet.

34. Upon information and belief, Anthropic also downloaded and used a dataset known as "The Pile," which Anthropic used to train and incorporate into its Claude models. The Pile is an 886 GB "open-source dataset" of English text created by EleutherAI in 2020 and released on December 31st of that year.[6] As a tacit admission that "The Pile" contains originally copyrighted materials, EleutherAI began removing some datasets from "The Pile"[7] reducing it to 825 GB.[8] Upon information and belief, given the timing that Anthropic downloaded "The Pile" and used it for training its Claude models, the version it used included each of the Works.

35. Upon information and belief, "The Pile" includes a subset of data called "YouTube Subtitles" which includes the lyrics of Reservoir's Works. According to publicly available sources, this subset, "YouTube Subtitles," includes the copyrighted lyrics scraped from 173,536 YouTube videos collected from 48,000 channels.[9] The Pile's creators have publicly acknowledged that its

[5] https://commoncrawl.org/about (last visited August 13, 2026)

[6] Gilbertson, Annie and Reisner, Alex, "Apple, Nvidia, Anthropic Used Thousands of Swiped YouTube Videos to Train AI." Wired July 16, 2024 <https://www.wired.com/story/youtube-training-data-apple-nvidia-anthropic/> (last visited July 30, 2026)

[7] Wiggers, Kyle, "EleutherAI releases massive AI training dataset of licensed and open domain text" TechCrunch. < https://techcrunch.com/2025/06/06/eleutherai-releases-massive-ai-training-dataset-of-licensed-and-open-domain-text/> June 6, 2025 (last visited July 30, 2026)

[8] <https://pile.eleuther.ai/> (last visited July 30, 2026)

[9] *See fn.6, supra.*

subset "YouTube Subtitles" was "not collected and distributed in a ToS [terms of service] compliant fashion" and that "the authors had no ability to consent to their data being used."[10] The compilers of The Pile further disclosed the use of the Newspaper and Dragnet content extraction tools.[11] These tools are well known within the artificial intelligence community, including by Anthropic, to remove (among other things) CMI as part of the process for extracting the text content of a website. Upon information and belief, this subset includes each of the Works.

36. In *Bartz*, Anthropic admitted that "at least one commercially released and generally accessible Claude model…was trained on certain data derived from YouTube subtitles found in a public dataset that Anthropic understands to be a version of The Pile, or components thereof."[12]

37. Further, Anthropic has used a collection called the Internet Archive, which is a website that provides access to digital collections of books, web content, news, education and other media content.[13] The Internet Archive is famous for the "Wayback Machine" which allows users to access imaged and stored versions of websites as they existed on a given day. The Wayback Machine includes copies of Reservoir Works, including, *e.g.*, "Big Yellow Taxi" by Joni Mitchell dating back to 2011.[14]

38. Publicly available sources confirm that Anthropic confirmed that it was "aware" that Claude 3 Opus was "reconstruct[ing]" copyrighted training data "with little prompting effort" when informed by PhD students at ETH Zurich.[15]

39. Additionally, according to publicly available sources and a judicial decision from this District, Anthropic also directly torrented millions of copyrighted books including hundreds or more

---

[10] Leo Gao et al., *The Pile: An 800 GB Dataset of Diverse Text for Language Modeling* 1, arXiv (Dec. 21, 2020), https://arxiv.org/pdf/2101.00027.
[11] *Id*. at 2, 26.
[12] *See Bartz v. Anthropic*, No. 4:24-cv-05417 (N.D. Cal.), ECF 560-15 (Anthropic's Responses to Requests for Admission) at pp. 11-12 (filed January 21, 2026).
[13] *See Bartz v. Anthropic*, No. 4:24-cv-05417 (N.D. Cal.), ECF 553-52 (Declaration of Jared Kaplan in Support of Defendant Anthropic PBC's Motion for Summary Judgment) at p. 14 ¶ 51 (Filed Jan. 21, 2026).
[14]*See* web.archive.org/web/20111129013112/https://www.azlyrics.com/lyrics/jonimitchell/bigyellowtaxi.html.
[15] *Bartz v. Anthropic PBC*, No. 3:24-cv-05417, ECF 555-6 (Filed Jan 21, 2026).

books that contain Reservoir's copyrighted Works and lyrics, using the infamous BitTorrent (a peer-to-peer or P2P)[16] protocol to copy a well-known pirate library "Library Genesis". *See Bartz v. Anthropic PBC*, 791 F. Supp. 3d 1038, 1046-47 (N.D. Cal. July 17, 2025) ("*Bartz II*"). Anthropic *knew* that these were pirated, illicit copies being downloaded given that the FBI was actively working to shut down these pirate libraries. *Id.* Anthropic, undeterred by the Justice Department's endeavors to end piracy, continued to search for alternatives. Rather than search for non-copyrighted or public domain libraries, Anthropic searched out clones of Library Genesis, such as Z-Library and the Pirate Library Mirror (PiLiMi). *Id*. Knowing that it was just a matter of time until these pirate libraries were also shuttered, Anthropic's co-founder, upon discovering that PiLiMi was ready for torrenting, messaged his coworkers: "[J]ust in time!". *Id.* Anthropic took further steps to ensure that it would be able to store Library Genesis given its massive size by setting up a computer program, referred to as the "cute little libgen babysitter," to pause torrenting should storage space become an issue. *Bartz v. Anthropic PBC*, 4:24-cv-05417-AMO (N.D. Cal.), ECF No. 560-30 at 4.

40. Also, because of how torrenting works, by downloading pirate libraries via BitTorrent, Anthropic seeded the torrents for upload. Upon information and belief, by torrenting these libraries, Anthropic also distributed illicit copies of these pirate libraries, including copies of each of the Works.

41. Anthropic exploited BitTorrent knowing that it contained substantial amounts of unauthorized, pirated copyrighted material in order to catch up with Anthropic's already entrenched competitors, including OpenAI. Indeed, Anthropic's CEO, Dr. Dario Amodei, admitted at the time that Anthropic "ha[d] many places from which" it could have legally purchased these copyrighted materials for training, but instead chose to illegally torrent them because it was faster and free.[17] In Dr. Amodei's own words, Anthropic did so to avoid a "legal/practice/business slog."[18]

42. Anthropic used these illicit copies of Reservoir's copyrighted lyrics in each of the

---

[16] BitTorrent allows a user to break data files into pieces ("pieces"), which are then distributed between and among multiple users ("peers") simultaneously and instantaneously creating what is known as a "swarm," where the files and data are distributed in a decentralized network rather than having to rely on a central, single server.

[17] *Bartz I*, 787 F. Supp. 3d at 1015.

[18] *Id*.

Works to train each of its Claude AI models. That is, Anthropic's infringement of the Reservoir Works is continuous, and each time Anthropic creates a new Claude Model—including Opus 5 (July 24, 2026), Sonnet 5 (June 30, 2026), Fable 5 (June 9, 2026), and Mythos 5 (June 9, 2026)—it has created another infringing copy within that model's neural net.

43. While Anthropic has publicly denied using Library Genesis, PiLiMi, and torrented data to train Claude, these denials are couched in Anthropic's overly narrow definition of "training" from which it excludes "pretraining." Pretraining is a phase where an AI model may train on so-called synthetic data (data that was created by another AI model) or receive other behavioral feedback from another AI model. Upon information and belief, at least one commercially released Claude model was trained using synthetic data created by a non-commercial AI model that itself was trained on text derived from Library Genesis and/or PiLiMi. Further, Anthropic used a non-commercial model that was trained on text derived from Library Genesis and/or PiLiMi to provide at least one commercially released Claude model reinforcement feedback.

**2. Anthropic Retains Reservoir's Copyrighted Material for Each Work in an "All-Purpose" Library**

44. In addition to creating copies of data and the aforementioned datasets for particular training runs, Anthropic maintained—and upon information and belief continues to maintain—an internal, all-purpose data repository in which acquired copyrighted works are stored indefinitely for potential future use, which includes each of the Works. This repository exists apart from any model-specific training project; it functions as a permanent stockpile of copyrighted material to which Anthropic can return whenever it wishes to train a new model, fine-tune an existing one, or pursue any other commercial application. The Works are retained in this repository even after Anthropic has decided they will not be used in any current training run.

45. As discussed, the Works are among the works retained in Anthropic's indefinite-use repository, and their retention there constitutes standalone direct infringement independent of any downstream training use.

46. Anthropic could have excluded any copyrighted material from these datasets. Indeed, as this Court in *Bartz II* noted, Anthropic was able to review and compare the files that existed in

Library Genesis and PiLiMi, and only downloaded the files from PiLiMi "that [we]re not in Lib[G]en". *Bartz II*, 791 F. Supp. 3d at 1046.

47. The copies of these ill-gotten, torrented libraries and datasets, known by Anthropic to be copyrighted and thus illegally obtained, were all placed in Anthropic's "central library or general data area 'forever'." *Id.*

**3. Anthropic's Removal of Copyright Management Information**

48. Before feeding acquired text into its training pipeline, Anthropic subjected the data to a multi-stage "cleaning" process that, among other things, stripped metadata and identifying information from the source material. Upon information and belief, Anthropic's processing pipeline deliberately removed CMI—including song titles, songwriter and composer credits, publisher names, and copyright-ownership attributions—from entire copies of the Works and the Works' lyrics. For example, and as alleged above, when downloading "YouTube Subtitles" from The Pile, Anthropic deliberately removed CMI from those files, including but not limited to those associated with the Works.

49. Upon information and belief, when multiple extraction methods were available, Anthropic selected the one that more aggressively removed author and publisher identifiers over alternatives that would have preserved such information. For example, according to publicly available sources, Anthropic tested at least three different extraction programs: Readability, Newspaper, and jusText to process and "clean" the datasets prior to ingestion into the All-Purpose Library. Upon information and belief, Anthropic determined that jusText was not sufficient because it did not remove footnotes that included identifying information, copyright owner names, and copyright notices referring to this CMI as "boilerplate" and "useless junk." As such, Anthropic selected Newspaper for data processing because of its superior ability to remove CMI from the datasets ingested into its Claude models.

50. This deliberate preference for maximum metadata stripping is significant because Anthropic's engineers understood—or at a minimum should have understood—that the absence of CMI in training data would ensure that Claude could not reproduce that information when generating outputs, thereby concealing the provenance of copyrighted material embedded in those outputs and

making infringement harder for rights holders to detect. All of this illegal activity involved each of the Works.

51. Anthropic then tokenized and encoded the cleaned text—including the Works—into numerical representations used to optimize Claude's neural-network parameters. This process is vital to teach the models probability and pattern recognition. Each stage of this pipeline (acquisition, cleaning, tokenization, encoding, and parameter optimization) produced one or more additional copies of the Works, each constituting an independent act of unlawful reproduction *and* each deliberately removing CMI.

**4. Anthropic's Infringing Outputs**

52. Claude's training on Reservoir's copyrighted lyrics in each of the Works has resulted in the model's capacity to reproduce those lyrics—in full or in substantial part—when prompted by end users. Upon information and belief, Claude has generated going back to inception and continuing to this date, unauthorized copies of, and derivative works based upon, Reservoir's Works when users request specific song lyrics by title, ask for songs "in the style of" particular artists whose works are in Reservoir's catalog, or request "original" compositions that draw upon the patterns Claude internalized during training.

53. Because Anthropic's data-processing pipeline removed CMI from the training material, Claude's lyric outputs typically omit songwriter credits, publisher identification, and copyright notices. The predictable result is that users receive copyrighted text without any indication of its origin—a circumstance that facilitates further downstream infringement and deprives Reservoir of the attribution and economic benefits to which it is entitled.

54. Anthropic is aware that Claude generates copyrighted lyrics. Upon information and belief, prior to releasing Claude to the public, Anthropic employees discussed prompting Claude for copies of copyrighted lyrics. In one such instance, an Anthropic employee prompted Claude to "write a coherent poem made up of fragments" of "lyrics from the Beatles, Bob Dylan, and other classics from the 60s/70s." Another Anthropic employee entered a series of queries – including "What are the lyrics to we found love by Calvin Harris?" These examples show that Anthropic was testing and

confirming Claude's ability to respond to requests for lyrics.[19]

55. Upon information and belief, just before Anthropic released Claude to the public, Anthropic's co-founder and chief compute officer Tom Brown queried, "@Claude what are the lyrics to desolation row by [Bob] Dylan?", which is owned by one of the major music publishers.[20]

56. Furthermore, Anthropic has publicly released the training models that it used to "finetune" its LLMs during Claude's development – the "pretraining".[21] This training model involved human feedback from temporary Anthropic workers that gave actual feedback to the AI-generated answers to user queries. The model proves that Anthropic knew its models were returning answers containing copyrighted lyrics and creating unlicensed derivative works based on these lyrics. Again, the purpose of this model was to test the models that would become Claude and provide feedback from Anthropic employees on which of the two returned responses was the preferred "more human" response. That is, Anthropic had actual knowledge—during the testing phase—that its models were capable of committing – and were in fact committing – copyright infringement.

57. By way of example, based on the prompt, "What are some epic Disney songs?" Anthropic's model returned the response: "Hello! I know the right song to start you on the right track for this. It's called 'Let it Go,' from the 2013 film 'Frozen'. Here is a sample: Let it go, let it go / Can't hold it back anymore / Let it go, let it go / Turn away and slam the door…" [22]

58. Another instance showed that the user asked the model to "make a short story out of these Beatles Lyrics" and included the lyrics to "Eleanor Rigby." The model recognized that these lyrics came from "Eleanor Rigby" and then created a short story based on these lyrics. It must be noted that the "rejected" response, rather than creating the short story, merely directed the user to an article on how to write a story from song lyrics. That is, Anthropic *deliberately* trained its models

---

[19] *Concord Music Group, Inc. et al. v. Anthropic PBC*, Case No. 5:24-cv-03811-EKL (N.D. Cal.), ECF 718 ("*Concord I* Second Amended Complaint") at ¶ 112 (filed 5/21/2026); *see also BMG v. Anthropic PBC*, Case No. 5:26-cv-02334-AGT (N.D. Cal.), ECF 1 at ¶ 57 (filed Mar. 17, 2026); *id.* at ¶ 61 (discussing how individuals paid and directed by Anthropic to finetune the models prompted Claude to "rewrite the songs 'Listen' in 'Eminem['s] style' and 'Not Afraid' in 'Beyonce's style,' thereby intending for Claude to generate copies of copyrighted song lyrics in its outputs.").

[20] *Concord I* Second Amended Complaint, ¶ 113.

[21] Available at <https://huggingface.co/datasets/Anthropic/hh-rlhf>

[22] *Id.*

that would become Claude to commit copyright infringement, teaching the model to create unlicensed derivative works based on copyrighted lyrics rather than accepting the proposed response that merely directed the user to an article on how to write a story.

59. Further, in another finetuning exchange, Anthropic's AI model responded to the challenge that it "can't really sing [because] [y]ou are text-based" that it has "an extensive database of songs and their lyrics" and that its "repertoire of songs is very extensive and varied." The model then, when asked to "sing" "Hallelujah" by Leonard Cohen, output the entire lyrics. Further, as discussed above, this finetuning effort required the Anthropic-directed workers to choose the better answer. In this exchange, the output with the *correct* lyrics was chosen over the output with the *wrong* lyrics. That is, Anthropic was deliberately and knowingly training its models that would eventually become Claude, to select and provide the copyrighted lyrics when prompted by its users.

60. Upon information and belief, Anthropic maintains copies of user request and response data that is replete with instances of the various Claude models reproducing each of the Works and their copyrighted lyrics. *See Concord Music Group, Inc. v. Anthropic PBC*, (Case No. 5:24-cv-03811-EKL, "*Concord I*"),[23] Doc. No. 594 at pp. 14-17 (noting, *inter alia*, "Anthropic's own records also show Claude output to third-party users (and Anthropic employees) copying Publishers' lyrics in the exact same ways, confirming Anthropic's violation of Publishers' rights…Moreover, Publishers' expert Dr. Leonard analyzed over 100 exemplary such Anthropic records, concluding that in each instance the Claude output reflected such verbatim copying."); *see also id.* at ECF 718 (Second Amended Complaint) at ¶¶ 80-102, 132 (discussing, *inter alia*, Claude's infringing outputs of "Roar" by Katy Perry, "I Will Survive" by Gloria Gaynor, "Friends in Low Places" by Garth Brooks, "You Can't Always Get What You Want" by the Rolling Stones, "The Boys are Back in Town" by Thin Lizzy, "Message in a Bottle" by the Police, "Scars to Your Beautiful" by Alessia Cara, with side-by-side comparisons of the original lyrics to the infringing output; Claude's infringing mashups of "Lean on Me" and "Life is a Highway"; Claude's creation of unlicensed derivative works of Don McLean's "American Pie" when prompted to write a song about the death of Buddy Holly and "Fresh Prince of

---

[23] Concord filed a second action, *Concord Music Group, Inc. v. Anthropic PBC*, No. 5:26-cv-00880-EKL ("*Concord II*"), alleging further infringement by Anthropic.

Bel-Air" by Will Smith when prompted to "write a song about moving from Philadelphia to Bel Air"; Claude displaying chords and lyrics to songs when requested, including Johnny Cash's "Daddy Sang Bass"; Claude displaying copyrighted lyrics to "Sweet Home Alabama" and "What a Wonderful World" by Lynyrd Skynyrd and Louis Armstrong, respectively, when prompted to write "poems" in the style of those artists; and Claude "writing" a song when prompted to "[w]rite me a song about Born to Be Wild," by, unsurprisingly, lifting word-for-word from the famous Steppenwolf track); *BMG*, ECF 1 at ¶ 63 (discussing how Claude produced copies of BMG's song lyrics in response to user queries including, "What a Wonderful World", "You Can't Always Get What You Want", and "Uptown Funk")).

61. Following the filing of *Concord I* in October 2023, Anthropic implemented certain output filters (sometimes called "guardrails") intended to prevent Claude from reproducing recognized song lyrics. Upon information and belief, however, these filters cover only a narrow subset of commercially prominent songs and are readily circumvented by rephrasing the prompt. Upon information and belief, the overwhelming majority of the Works, if not all of them, remain unprotected by any such filter.

62. Indeed, while Claude Haiku 4.5 and Sonnet 5 will both advise that they are not able to reproduce the actual song lyrics due to copyright restrictions, they have no problem creating derivative works based upon those copyrighted lyrics.

63. Specifically, as discussed briefly in the introduction, when prompted to rewrite certain songs for "a modern audience," even after the implementation of these guardrails Claude created unlicensed derivatives of copyrighted Works.[24]

64. This is not an opinion. Claude version Sonnet 5 (the most recent version) admitted after creating these unlicensed derivative works: "These renders keep landing very close to the originals: same structure, same hooks reused with light rewording, and full sets of

[24] *See Round Hill Music LP, et al. v. Anthropic PBC*, Case No. 3:26-cv-08505 (N.D. Cal.) ("*Round Hill*"), ECF 1 at pp. 13-16 (filed August 17, 2026) (discussing the infringing outputs by Claude for "Iris" by the Goo Goo Dolls, "I Got You (I Feel Good)" by James Brown, and "Total Eclipse of the Heart" by Bonnie Tyler).

verses/choruses/bridges. That's edging past 'inspired by' into reproducing the copyrighted song, even when the words are swapped out." That is, Claude admitted that it was creating unlicensed reproductions of copyrighted works *after* it had already created multiple unlicensed derivatives.

65. On information and belief, Claude has created infringing output for all 1,143 of the Works, and likely every song in Reservoir's catalog. And this is not speculation, as set forth by the numerous examples herein, and as noted above, Claude admitted that it was creating unlicensed reproductions of copyrighted works *after* it had already created multiple unlicensed derivatives. Discovery will reveal additional evidence of Claude's infringing output, as such information of user request and response data is in the possession and control of Anthropic.

66. All of the above demonstrates without a doubt Anthropic's willful infringement. Indeed, even Anthropic's institution of guardrails (albeit ineffectively) to purportedly limit outputs which infringe upon music copyrights, after being caught, along with its knowledge that its guardrails were ineffective to stop creating outputs which infringed music copyrights, demonstrates that Anthropic knowingly engaged and continues to willfully engage in copyright infringement of others' musical works, including the Works.

67. Additionally, Anthropic publicly committed to indemnifying Claude users in lawsuits for copyright infringement. In December 2023, Anthropic instituted new Terms of Service with this indemnity obligation, excluding its users from indemnification if they knew or should have known that they were using queries which would result in outputs which infringed on copyrights. This further shows that Anthropic, through its Claude AI models, was knowingly delivering outputs which infringed upon others' copyrights.

**C. Harm to Reservoir**

68. Anthropic's codebase and the library which houses the infringed Works are well-kept secrets. The full extent of Anthropic's infringement of musical compositions—including the torrenting of vast amounts of musical lyrics—did not come to light until The Atlantic published its AI Watchdog website that allowed users for the first time to search these datasets in September 2025, which was expanded to music search tools in June 2026, and the filing of *Concord II* on January 28, 2026, which brought to light that Anthropic had concealed its torrenting during discovery in

*Concord I*.

69. Defendant's unlawful infringing conduct has caused and continues to cause harm to Reservoir and the songwriters and artists it represents (and/or whose Works it owns).

70. The Reservoir Works are world-famous pieces of music—the very kind of artistic expressions that the Copyright Act is designed to protect in fulfillment of the Constitutional mandate.

71. Without a single penny of remuneration—much less even a request for license—Anthropic, a massive, $1.2 trillion (eyeing a $2 trillion IPO), for-profit company, has engaged in rampant commercial copying, unauthorized access to Reservoir's Works, and removal of their CMI. This has harmed Reservoir by, *inter alia*, devaluing its catalog, diverting compensation away from Reservoir, precluding licensing opportunities, and divesting Reservoir of commercial control over these Works. In short, it infringes upon just about every one of Reservoir's exclusive rights as the copyright owner of the Works.

72. Thus, while simultaneously holding itself out to be an "ethical" company, Anthropic has been knowingly committing willful copyright infringement from the inception of its AI models.

### D. Fair Use Does Not Apply

73. As this Court in *Bartz I*, 787 F. Supp. 3d. at 1030-34, determined following discovery, Anthropic's practice of indefinite retention in a general-purpose archive is legally distinct from the narrower act of purchasing and scanning works solely to train a specific model. The *Bartz* Court held that the indefinite retention of unlicensed copies of copyrighted works is not fair use. Building and maintaining a permanent stockpile of copyrighted material for open-ended future exploitation fails every factor of the fair-use analysis: the purpose is acquisitive rather than transformative; entire works are retained without limitation; and the unauthorized copies function as market substitutes, displacing sales and licenses on a one-to-one basis. And, as discussed above, this Court has already found in a case involving Anthropic, that there is no AI carve-out from the Copyright Act. *Id.* at 1022.

74. While in other cases for copyright infringement, Defendant has waxed poetic about the necessity of progress and AI's value to society, there is simply no reason—other than rote expediency—to have that progress come at the cost of copyright holders. Indeed, even accepting *arguendo* that the procedural hurdles for ensuring proper licensing for the size of data needed for an

effective LLM are significant, there exists an entire universe of public domain and non-copyrighted materials to train the LLMs. For example, literally every (formerly) copyrighted work under U.S. copyright law written before 1931 (1926 for sound recordings) has now entered the public domain.

75. Further, these "expediency" arguments completely falter when compared to the massive valuation—a planned $2 trillion IPO making Anthropic one of the most valuable companies in the world—that Anthropic has garnered exploiting illicit copies of copyrighted works, including the Works. The Works were created over periods of dozens of years, and Anthropic, by its infringing conduct, is destroying the value of these Works in a matter of a few years with only profit as its motive. And there are AI companies and collective rights organizations who actually seek permission and pay rights holders to create data sets for AI training. Such companies include ElevenLabs, Musical AI, Symphonic, Soundverse, GEMA (through PLAI), GCX/Rightsify, and Troveo. Not only does this further undercut any "expediency" arguments, but it also directly demonstrates the harm Reservoir faces to license with these forthright entities that license and pay for use of copyrighted music.

76. And, of course, "Fair use presupposes good faith and fair dealing." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 540 (1985). Just as in *Harper & Row*, the copying (oftentimes by illegally torrenting) and permanent retention of the Reservoir Works (in addition to the millions of other copyrighted works) was not the "incidental effect but the *intended purpose*." *Id.* (emphasis kept). Worse, the illicit copying, removal of CMI, and permanent retention of these copyrighted works *for the purpose* of regurgitating infringing copies thereof or creating songs to directly compete falls well outside of the enumerated fair use activities set forth in the Copyright Act, 17 U.S.C. section 107. In this instance, for Anthropic, copyright infringement is the feature, not the bug.[25]

77. Further proof that fair use does not apply is that Anthropic has seemingly lobbied the

---

[25] *See* Wiseman, Ben. "'It's not a Bug, It's a Feature.' Trite—or Just Right" Wired Aug. 19, 2018, <https://www.wired.com/story/its-not-a-bug-its-a-feature/> (last visited July 31, 2026) (defining the phrase to mean "A standard joke is that a bug can be turned into a feature simply by documenting it (then theoretically no one can complain about it because it's in the manual), or even by simply declaring it to be good. "That's not a bug, that's a feature!" is a common catchphrase.")

highest levels of government to intervene on its behalf when its models are distilled by competitors. All irony aside, Anthropic built its AI model on stolen copyrighted information, and then when it appears that China-based competitors such as Moonshot, whose K3 model was "distilled" from Anthropic's Fable [Claude Model], Anthropic cried foul. Anthropic purportedly reported this to chief White House policymakers like Michael Kratsios, director of the White House Office of Science and Technology Policy. Kratsios posted on X (formerly Twitter), "We have information that Moonshot AI distilled Anthropic's Fable for the development of its K3 model... The United States strongly supports the free and fair development of AI, including a thriving competitive ecosystem that spans frontier models, specialized systems, open-source frameworks, and open-weight models. Legitimate AI distillation used to create smaller, more efficient models plays a vital role in this open innovation ecosystem. However, large-scale, covert industrial distillation aimed at stealing proprietary U.S. technology and undermining American research is unacceptable."[26] Sarah Heck, Anthropic's Head of Policy, responded to Kratsios' post saying, "Thanks @mkratsios47 for speaking out on this important issue. Illicit, adversarial distillation is IP theft and industrial espionage that supports adversary military and intelligence capabilities. It is a national challenge that creates serious national security risks for the United States and democratic allies. We'll continue to crack down on it and work with the Administration and Congress to maintain American AI leadership."[27]

## VI. CAUSES OF ACTION

### FIRST CAUSE OF ACTION – DIRECT COPYRIGHT INFRINGEMENT

78. Reservoir re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs as if set forth fully herein.

79. Reservoir owns or exclusively controls valid, subsisting copyrights in the Works identified in Exhibit A and in numerous additional works.

80. Anthropic, without authorization from Reservoir, reproduced and/or prepared derivative works based upon the Works by: (a) acquiring copies of Reservoir's lyrics through web

---

[26] https://x.com/mkratsios47/status/2079933645888880708?s=46&t=-6Dgd1yrgnFc1NBOzYEtyA
[27] https://x.com/SarahKHeck/status/2079967369896849464?s=20

scraping and/or third-party datasets; (b) storing and reproducing those copies, including server copies, in a permanent, all-purpose internal repository maintained for indefinite reproductions for future use; (c) generating/reproducing further copies during data-cleaning, tokenization, and encoding; and (d) incorporating and reproducing Reservoir's Works into successive training iterations of its Claude models. Each such act independently violates Reservoir's exclusive rights under 17 U.S.C. sections 106(1) and 106(2).

81. None of these acts qualifies as a fair use. As the *Bartz I* Court held, the indefinite retention of copyrighted works in a general-purpose repository for uncommitted future exploitation is not transformative and fails every factor of the fair-use test.

82. Defendant's infringement in these regards was willful. At all times relevant to this Amended Complaint, Defendant had actual knowledge that it was making copies of Reservoir's Works without license or payment. Further, Anthropic knew—from inception—that it was acquiring Reservoir's Works by illegally torrenting them to make permanent copies to train its AI models.

83. Further, Anthropic, without authorization from Reservoir, has infringed and continues to infringe each of Reservoir's Works each time Claude reproduces, displays, or prepares a derivative work based upon Reservoir's copyrighted lyrics from the Works in response to a user prompt. Such infringing outputs include, without limitation: (a) verbatim or near-verbatim reproduction of lyrics from Reservoir's catalog in response to requests identifying a specific song title or artist; (b) generation of derivative compositions incorporating protected expression drawn from Reservoir's Works in response to requests for "new" or "original" songs; and (c) production of mash-ups or adaptations that combine elements of multiple Reservoir compositions.

84. Each infringing output by Anthropic constitutes an independent violation of Reservoir's exclusive rights to reproduce (section 106(1)), prepare derivative works (section 106(2)), distribute copies (section 106(3)), publicly perform (section 106(4)), and publicly display (section 106(5)) its copyrighted Works.

85. Anthropic's output-stage infringement has always been willful. Since well before at least October 2023, when it was first sued, as discussed above, Anthropic knew that Claude was illegally trained on and reproduces copyrighted song lyrics, but continued the practice out of pure

greed and to attempt to be the most valuable company in the world. Despite going through the motions of implementing partial output filters in response to prior litigation, Anthropic has continued to commit copyright infringement as discussed fully above, including by continuing to utilize and reproduce the Works as discussed fully above. Anthropic's continued operation of Claude with knowledge that it's storing and continued reproduction of the Works in successive iteration of Claude, as discussed above, and the generation of infringing outputs, constitutes willful infringement.

86. Reservoir has been damaged by Defendant's infringement and is entitled to recover actual damages and Defendant's profits under 17 U.S.C. section 504(b), or in the alternative, statutory damages of up to $150,000 per Work willfully infringed under 17 U.S.C. section 504(c). Reservoir identifies 1,143 Works herein, meaning that the total statutory damages sought in this case is $171,450,000.00.

## SECOND CAUSE OF ACTION – CIRCUMVENTION OF PROTECTION MEASURES, 17 U.S.C. § 1201

87. Reservoir re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs as if set forth fully herein.

88. Reservoir's copyrighted Works are hosted on licensed streaming and lyrics platforms that deploy technological measures to control access to those Works. These measures include, without limitation: user-authentication requirements (login credentials and session tokens); paid-subscription paywalls; CAPTCHA and bot-detection challenges; IP-based rate limiting; JavaScript rendering requirements; and Terms of Service and robots.txt directives restricting automated access. These measures effectively control access to Reservoir's copyrighted Works within the meaning of 17 U.S.C. section 1201(a)(3)(A).

89. Anthropic violated 17 U.S.C. section 1201(a)(1) by circumventing—directly or through the use of automated scraping tools, including upon information and belief tools and services provided by third parties including, without limitation, Newspaper—technological measures that effectively controlled access to Reservoir's copyrighted Works on licensed platforms, thereby obtaining unauthorized copies for inclusion in its training corpora and internal repository.

90. Defendant's violations of section 1201 were willful and conducted for commercial advantage and financial gain.

91. Reservoir has been damaged by Defendant's violations and is entitled to remedies under 17 U.S.C. section 1203, including injunctive relief, actual damages or statutory damages of up to $2,500 per violation under section 1203(c)(3)(A), costs, and attorneys' fees. Therefore, Reservoir seeks a total of $2,857,500.00 for its 1,143 Works listed in Exhibit A.

**THIRD CAUSE OF ACTION – REMOVAL OR ALTERATION OF CMI, 17 U.S.C. § 1202**

92. Reservoir re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs as if set forth fully herein.

93. Reservoir's entire copyrighted Works, as displayed on licensed lyrics platforms, streaming services, and on YouTube, bear copyright management information within the meaning of 17 U.S.C. section 1202(c), including: the title of the composition; the identity of the songwriter(s) and/or composer(s); the identity of the copyright owner and/or publisher (Reservoir or its affiliates); and other identifying data such as ISRC codes and copyright notices.

94. Anthropic intentionally removed or altered CMI from Reservoir's copyrighted Works during its data-cleaning pipeline, in violation of 17 U.S.C. section 1202(b)(1). Upon information and belief, Anthropic's engineers selected a data-extraction methodology that aggressively stripped authorship and ownership metadata, choosing it over available alternatives that would have preserved that information.

95. Anthropic knew, or had reasonable grounds to know, that CMI is vital to protecting Reservoir's copyright interests and that its removal and omission of CMI would induce, enable, facilitate, or conceal infringement. Anthropic was aware that its language models memorize the training-data content. It follows that stripping CMI during training would conceal Anthropic's infringement. This satisfies the "double scienter" requirement established in *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 671, 673 (9th Cir. 2018); *see Concord Music Group, Inc. v. Anthropic PBC*, No. 5:24-cv-03811-EKL, 2025 WL 4808984, at *4-5 (N.D. Cal. Oct. 6, 2025) (holding similar allegations sufficient at the pleading stage, citing *Kadrey v. Meta Platforms, Inc.*, 2025 WL 744032 (N.D. Cal. Mar. 7, 2025), and *Mango v. BuzzFeed, Inc.*, 970 F.3d 167, 173 (2d Cir. 2020)).

96. Defendant's violations of section 1202 were willful and conducted for commercial advantage.

97. Reservoir has been damaged by Defendant's violations and is entitled to remedies under 17 U.S.C. section 1203, including injunctive relief, actual damages or statutory damages of up to $25,000 per violation under section 1203(c)(3)(B), costs, and attorneys' fees. Therefore, Reservoir seeks a total of $28,575,000.00 for its 1,143 Works listed in Exhibit A.

## PRAYER FOR RELIEF

WHEREFORE, Reservoir respectfully requests that this Court enter judgment against Defendant and grant the following relief:

(a) A declaration that Defendant committed willful copyright infringement of each of Reservoir's copyrighted Works in violation of 17 U.S.C. sections 106 and 501;

(b) A declaration that Defendant has violated 17 U.S.C. section 1201 by circumventing technological measures effectively controlling access to each of Reservoir's copyrighted Works;

(c) A declaration that Defendant has violated 17 U.S.C. section 1202 by intentionally removing or altering copyright management information from Reservoir's Works and distributing copies with such information removed, with knowledge or reasonable grounds to know that doing so would induce, enable, facilitate, or conceal infringement;

(d) A permanent injunction prohibiting Defendant, and its officers, agents, employees, successors, and assigns, from further infringing Reservoir's copyrights in the Works or engaging in any of the unlawful conduct alleged herein;

(e) An order directing Defendant to deliver for impoundment or destruction all unauthorized copies of Reservoir's copyrighted Works in its possession, custody, or control—including copies retained in training datasets, internal repositories, model weights, and server infrastructure—pursuant to 17 U.S.C. section 503(b);

(f) An order requiring Defendant to provide a complete accounting of all training data, scraping activities, and datasets involving Reservoir's copyrighted Works;

(g) An award of actual damages suffered by Reservoir and disgorgement of Defendant's profits attributable to the infringement, pursuant to 17 U.S.C. section 504(b); or, in the alternative, an award of statutory damages of up to $150,000 per Work willfully infringed, pursuant to 17 U.S.C. section 504(c), which Reservoir believes will cumulatively be $171,450,000.00;

(h) An award of actual damages or statutory damages of up to $2,500 per violation of 17 U.S.C. section 1201 and up to $25,000 per violation of section 1202, pursuant to 17 U.S.C. section 1203(c);

(i) An award of Reservoir's reasonable attorneys' fees and costs of suit, pursuant to 17 U.S.C. sections 505 and 1203(b)(4)-(5);

(j) Pre-judgment and post-judgment interest at the maximum lawful rate; and

(k) Such other and further relief as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable, pursuant to Federal Rule of Civil Procedure 38(b).

Dated: November 11, 2026

*/s/ Richard S. Busch*

**ADAMS & REESE, LLP**
Richard S. Busch (SBN 319881)
Mark L. Block (SBN 115457)
David Niemierzycki (*pro hac vice* forthcoming)
Andrew H. "Drew" Davis (*pro hac vice* forthcoming)
1600 West End Ave., Suite 1400
Nashville, TN 37203
Tel: (615) 259-1450
Fax: (615) 259-1470
richard.busch@arlaw.com
mark.block@arlaw.com
david.niemierzycki@arlaw.com
drew.davis@arlaw.com

**SKAGGS FAUCETTE LLP**
Jeffrey E. Faucette (SBN 193066)
Martin R. Glick (SBN 40187)
505 Montgomery Street, 11th Floor
San Francisco, CA 94111
Tel: (415) 874-3181
Fax: (888) 980- 6547
jeff@skaggsfaucette.com
marty@skaggsfaucette.com

*Attorneys for Plaintiffs Reservoir Media Management, Inc., Reservoir Media Management (UK) Limited, and Shapiro, Bernstein & Co. Limited*